IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA          )
                                  )
        v.                        )          CR. NO. 2:08cr147-WKW
                                  )
TRAVIS DARNELL OSBORNE            )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

This case is before the court on defendant's motion to suppress (Doc. # 15), his supplemental motion to suppress (Doc. # 16), the government's response to the motion to suppress (Doc. # 30), and the evidence adduced at the hearing held on January 22, 2009. For the reasons set out below, the motions to suppress are due to be granted in part and denied in part.

### Facts

On November 14, 2005, an unidentified postal customer witnessed an individual stealing mail from mailboxes in a Montgomery, Alabama neighborhood and notified police. On the following day, a patrolman picked up defendant Travis Osborne, who matched the description provided by the complainant, in the same neighborhood. Police found approximately 15 pieces of stolen U.S. mail in defendant's possession.

Osborne was detained and transported to the Montgomery Police Department (MPD), where he was interviewed by MPD Detective Gaskin and Jim Tynan, a U.S. Postal Inspector. The interview – during which defendant was read his *Miranda* rights and thereafter confessed to stealing mail, to using stolen account numbers for free 30-day AOL internet

service to access music sites, and to occasional drug use – began at 11:45 a.m. and concluded

at 12:25 p.m. The interviewed was recorded.

During the interview, the officers requested and received written consent to search

defendant's apartment. Exhibit 4. While defendant remained at the MPD, Gaskin and Tynan

searched his apartment pursuant to his consent and found multiple pieces of stolen U.S. mail

and other documents which did not belong to defendant, written notes containing routing and

account numbers, and a Dell computer. Following the search of the apartment, the officers

returned to the MPD, informed defendant of what they had found, and asked him to sign a

form giving them written consent to search the computer recovered from the apartment.

Defendant signed the consent form at 1:54 p.m., see Exhibit 5, and his computer was

thereafter searched.[1]

## Discussion

Statements

Defendant contends that certain statements that he made during the interview were

involuntary because officers induced him to make those statements by promising him that

he would not go to jail if he told them the truth.

The Fifth Amendment prohibits the use of an involuntary confession against a

defendant in a criminal trial. United States v. Vallas, 218 Fed.Appx. 877, 879, 2007 WL

---

[1] No testimony was presented at the evidentiary hearing concerning the contents of the computer. For purposes of this recommendation, the court assumes that the computer contained incriminating information.

559813, 1 (11th Cir. 2007).  The court determines voluntariness "based upon the totality of the circumstances, construing the facts in the light most favorable to the prevailing party." United States v. Walton, 323 Fed.Appx. 837, 841, 2009 WL 1066979, 3 (11th Cir. 2009) (citation omitted). The voluntariness inquiry is focused "'on whether the defendant was coerced by the government into making the statement: The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception.'" Vallas, 218 Fed.Appx. 877 at 879, 2007 WL 559813 at 1 (citation omitted).

"[A] statement is not given voluntarily if it is 'extracted by any sort of threats or violence, or obtained by any direct or implied promises, or by the exertion of any improper influence.'" Walton, 323 Fed.Appx. 837, 841, 2009 WL 1066979, 3 (citation omitted); see also United States v. Mercer, 541 F.3d 1070, 1075 (11th Cir. 2008) ("A statement is not voluntary if it is 'obtained by any direct or implied promises, however slight ....'")(citations omitted).

In this case, it is undisputed that defendant's interrogation was custodial and that defendant received Miranda warnings before making any statement. However, "[t]he requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry." Dickerson v. United States, 530 U.S. 428, 444 (2000). Although "'[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was "compelled" despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare,'" a defendant's will still may be overborne by the

3

circumstances surrounding the giving of a confession. <u>Id.</u>

     During the interview, the following colloquy occurred:

| | |
|---|---|
| O[2]: | Ya'll gonna, I'm under arrest now ain't I? |
| T[3]: | No. |
| G[4]: | No, you're being honest. |
| O: | I just don't want to go, I mean, you know, I mean. |
| G: | Does anybody live with you Travis? |
| O: | I stay by myself. |
| G: | You stay by yourself. |
| T: | Do you have a computer? |
| U[5]: | Yeah. |
| T: | Are you the one that's using the credit card numbers to buy stuff off the internet, and making up Didi and Eric here? You got to tell us, man, okay? |
| O: | I [unintelligible] if I tell y'all I'm a go to jail. |
| T: | No, no, we, we got to find out what happened. Okay, we're gonna find out one way or another but it's better than you're honest with us up front here cause this, this Didi and Eric ... |
| O: | He said if I lied I was gonna go to jail. |
| ***G:*** | ***If you lie, but as long as you tell us the truth then you won't.*** |

Exhibit 1 (Court's transcription of the recorded statement) (emphasis added).

     In its response to the motion to suppress, the government concedes "that the statement made by Sergeant Gaskin is of the kind likely to induce a suspect to make an incriminating statement." Response (Doc. # 30) at 5. It proposes that "the portion of the interview following the statement which Osborne argues is unconstitutional may be struck ... ." <u>Id.</u> at

---

[2] Defendant Travis Osborne.

[3] U.S. Postal Inspector J. D. Tynan.

[4] MPD Detective W. B. Gaskin.

[5] Unknown speaker, most likely Tynan.

6.  Under the totality of the circumstances – which includes defendant's expression during the interview of his strong desire not to go to jail; the fact that he was at times nervous, agitated, and tearful; the unequivocal promise by Detective Gaskin that if defendant told the truth he would not go to jail; and the government's concession that this promise was improper – the court concludes that the portion of the interview following Gaskin's statement is due to be excluded from evidence and deemed inadmissible for any purpose at trial.[6]

Consent to search apartment

Defendant contends that his consent to search his apartment was invalid because he gave it only after officers promised him that he would not go to jail if he told them the truth.

Under controlling case law, the court is "required to conduct two separate inquiries where a consent to search follows prior illegal activity by the police. First, a court must determine whether the consent was voluntary. Second, the court must determine whether the consent, even if voluntary, requires exclusion of the evidence found during the search because it was the 'fruit of the poisonous tree'" – in this case, the product of a coerced confession.[7]  United States v. Delancy, 502 F.3d 1297, 1308 (11th Cir. 2007). "Thus, the voluntariness of consent is only a threshold requirement; a voluntary consent to search does

---

[6] See United States v. Liu, 2008 WL 1994977, 16-17 (D. Minn. 2008) (Statement elicited by law enforcement promise that defendant would not go to jail suppressed as involuntary, and deemed inadmissible for any purpose.).

[7] Although many "fruit of the poisonous tree cases" involve illegal searches or arrests, "the Wong Sun analysis focused on determining when prior illegal activity may be considered free of the taint of that activity – the specific form of the Fourth Amendment violation does not seem determinative." Id. at 1309, n. 9.

not remove the taint" of the coerced confession. Id. "[T]he second requirement focuses on causation: 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" Id.(citation omitted); see also United States v. Ramirez-Chilel, 289 F.3d 744, 752 n. 9 (11th Cir.2002) ("Typically, if the ensuing search occurs after an initial illegality, such as an illegal entry or an illegal arrest, we must first determine whether the consent to search was voluntary and then, whether the consent was tainted by the initial illegality."). The court is obliged to determine whether the consent was sufficiently an act of free will to purge the primary taint or, alternatively, whether the causal connection had become so attenuated as to dissipate the taint." Delancy, 502 F.3d. at 1309.

The "two step approach is mandatory, and the government bears the burden on both issues." Id. "This is a fact-specific question, and no single fact is dispositive." Id. Three factors in particular are relevant in determining whether a defendant's consent was tainted by the coerced confession: (1) the temporal proximity of the confession and the consent, (2) the presence of intervening circumstances, and, particularly, (3) the purpose and flagrancy of the official misconduct." Id. These three factors "are not meant to be exhaustive, and commentators have suggested others." Id. at 1309-10 (noting factors such as "'whether the seizure brought about police observation of the particular object which they sought consent to search, ... whether the consent was volunteered rather than requested by the detaining officers, whether the arrestee was made fully aware of the fact that he could decline to

6

consent and thus prevent an immediate search of the car or residence, whether there has been a significant intervening event such as presentation of the arrestee to a judicial officer, and whether the police purpose underlying the illegality was to obtain the consent.'") (citation omitted). A factor-based analysis should not "obscure the underlying question, which 'generally involves a pragmatic evaluation of the extent to which the illegal police conduct caused the defendant's response.'" Id. at 1310 (citation omitted). "Nevertheless, the factors do provide a useful structure." Id.

1. *Voluntariness*

"A consensual search is constitutional if it is voluntary; if it is the product of an essentially free and unconstrained choice." United States v. Acosta, 363 F.3d 1141, 1151 (11th Cir. 2004) (citations and internal quotation marks omitted). "Voluntariness is a question of fact based on the totality of the circumstances." Id. "The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily." Id. (citations and internal quotation marks omitted).

"In assessing voluntariness, the inquiry is factual and depends on the totality of the circumstances.... In evaluating the totality of the circumstances underlying consent, the court should look at several indicators, including the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found." United States v. Simms, 385 F.3d 1347, 1355

(citations and internal quotation marks omitted).

The following discussion concerning the consent to search took place during the interview:

T:    What I'm gonna do here with you is based on what we talked about okay, myself and Detective Gaskin, we'd like you to give us consent to go ahead and go in your apartment and look for any, any other mail, okay? You, you can do that by completing this form and I'll help you, okay? That's, that's the easiest way to do it, okay?

O:    So what's gonna happen to me?

T:    Well right now we got, right now we have to see what else it is that you've got before we can, before we can make a decision, okay?

O:    Am I in big trouble?

T:    Well we need to find out, okay?  Now, now I will tell you, Travis, okay, what you've done is, is you've stolen U. S. Mail, okay, and, and that in and of itself is a felony and it is a federal offense, okay? That being said, we're not done with our investigation yet, okay. You, I, appreciate you sitting down here and talking to us and telling us what you did, okay. Is there anything else that you, you can think of that you haven't told us maybe that we haven't asked?

                            * * *

T:    Let's, let's do this form here Travis and you, you told Detective Gaskin earlier that you can read, is that correct? Can you read? You can read?

O:    Pretty much, pretty much.

T:    Pretty much. Okay. Well, I'm gonna read this form to you and we'll fill it out together here. It says "I" – go ahead and write your name.

G:    You're left-handed, aren't you?

T:    Are you left-handed? Hold on, we'll [unintelligible]. What was the last grade you completed, Travis?

O:    11th.

T:    Where at?

O:    Wisconsin.

T:    What's the name of the high school?

O:    Pulaski High School.

T:    Is that in Pulaski, Wisconsin?

O:    Milwaukee.

T:    Okay, it says, "have been informed and understand my constitutional

8

rights not to have a search made of my apartment." You can write "my apartment" right there. Okay, "without the requirement of a search warrant. I've also been informed of and understand my rights to refuse to consent to search; however, I hereby authorize U.S. Postal Inspector," Tynan, T-Y-N-A-N, or detective Gaskin, G-

O:   Don't tell me, don't tell me.

T:   G-A-S-K-I-N, "to conduct a search of, conduct a search of," put your initials there, okay, "my apartment located at" and write the address. Is that Montgomery, Alabama?

O:   Yes.

T:   "The U.S. Postal inspectors is/are authorized by me to take from the above-described property any letters, papers, materials, or other property which is contraband or evidence and, specifically," U.S. Mail, stolen property. Write U.S. Mail right there or stolen property.

O:   I don't understand stolen property.

G:   Well, any stolen property, that's stolen mail, that's what he's talking about.

T:   Yeah, stolen mail. "I understand that this contraband or evidence may be used against me in court of law or an administrative proceeding. I understand my right to withdraw my consent at any time. This written permission is being given by me to the above-named persons freely and voluntarily without threats, promises or coercion of any kind to have me consent to the search and/or sign this form. I realize that I may ask for and receive a receipt of all things taken." You understand what that means?

O:   Well, I guess whatever ya'll take out of there...

T:   Well...

O:   ... that ain't mail.

T:   ...we'll only take what we need to take, okay, and we will leave a copy, a listing of the items we removed, okay? Do you understand that?

O:   I don't understand. I'm not trying to be hard, I mean a hard head, I mean.

T:   What that means is we're gonna go in and we're gonna look for items that, that we've talked about here today. Okay?

O:   So where would I be, I mean?

T:   Where would you be? We got two options, you can be right here or if you would like you can go down there and observe, but understand that if you do that you will be in handcuffs, okay, under the control of law enforcement. Okay, I don't know if you want your neighbors to see you coming in and out like that, but that's the only way we can do it at this point, do you understand that?

9

O:    I mean, what I'm really trying to get at, man. I mean...

T:    Do what?

O:    I mean...

T:    Okay.

O:    What I'm really trying to get at, man...

T:    Here you go, sign your name here. Okay.

O:    What I'm really trying to get at ...what are my chances of going, of going to jail?

G:    We don't know yet, Travis. We told you that we need to do further investigation. That's what we're telling you, okay?

O:    Well, that's enough right there to take me to jail.

T:    Again, you, you're right, it is enough to take you to jail.

O:    Well, I'm just saying, but I, I mean.

T.    Okay, we're, we're trying to do, we're trying to do right by you, we want to get...

O.    So is ya'll trying to put me in jail? Just be honest with me, is ya'll trying to put me in jail or ....

T.    We need to know what else is it that you've done that we don't know about okay, before we can determine how we're gonna handle it. Okay, cause there's two ways this could go. Okay, it could go and be prosecuted by the City of Montgomery or it can come over and be prosecuted in federal court and based on what we find, Detective Gaskin and I will get together and we'll determine the best, the best avenue.

O.    So in either way I'm a be arrested though, right? Just be honest with me.

G.    That's debatable. I can't...

O.    I mean.

G.    I can't tell you that until we complete our investigation, Travis.

O.    But see this is enough, I mean, could I get one of those letters, I mean. I just use this as a letter.

T.    I'm gonna have you initial and date all these.

Exhibit 1 (Court's transcription of the recorded statement).

In the instant case, the court does not find that Tynan and Gaskin used coercive police procedures to secure defendant's consent to search. Their tone was not menacing, but calm and measured, and Tynan took pains to explain defendant's rights, including his right to

refuse or withdraw consent. Defendant indicated that he had an 11th grade education, and, even though he was upset and sometimes tearful during the interview, he freely asked questions and received clarification. Defendant also participated in filling out the consent form himself, and he acknowledged by signing the form that he understood that any evidence found could be used against him in a court of law or an administrative proceeding, and certified that he was giving written permission to the officers freely and voluntarily without threats, promises, or coercion of any kind to have him consent to the search and/or sign the form.

Further, although defendant clearly was concerned about possibly going to jail, the officers did not promise that if he consented to the search he would not be incarcerated. On the contrary, Tynan informed defendant that he had stolen U. S. Mail which "in and of itself is a felony and it is a federal offense," and also told defendant that the offense "could go and be prosecuted by the City of Montgomery or it can come over and be prosecuted in federal court." When defendant said, "Well, that's enough right there to take me to jail," Tynan responded truthfully, "Again, you, you're right, it is enough to take you to jail." Thus, under the totality of the circumstances, the court concludes that defendant's consent to search was voluntary.

2. *Fruit of the poisonous tree*

Even though defendant's consent to search passes the threshold test of voluntariness, the court also must determine whether, granting the officers' coercion of certain statements from defendant, his consent was secured by exploitation of that illegality or instead by means

11

sufficiently distinguishable to be purged of the primary taint.

### A. Temporal Proximity

According to the Eleventh Circuit, "[t]he time elapsed between the illegal act and a subject's consent to search is obviously relevant. If only a short period of time has passed, a court is more likely to consider the consent as a 'poisonous fruit" of the illegal act – that is, that the consent is tainted." Delancy, 502 F.3d. at 1310. The Court has noted that "[t]here is no bright-line rule defining the temporal factor. But, if the period of time is extremely short, this factor weighs in favor of exclusion." Id. "By contrast, a longer interval obviously weighs in favor of admissibility." Id.

Approximately seven minutes of the interview elapsed between Gaskin's statement to defendant that he would not go to jail if he told the truth, and Tynan's request for consent to search. This is a relatively brief period of time. However, as in Delancy, the interaction during the interview was conversational in tone, and the officers did not threaten defendant in any way. Defendant was detained and handcuffed during the interview, but the officers did not aim their guns at defendant or otherwise attempt to force him to sign the consent form, as defendant himself acknowledged. On these facts, as the Delancy court noted, timing is not the most important factor.

### 2. Intervening Circumstances

"The second factor is the presence of intervening circumstances, or events that interrupt the causal connection between the illegal act and the possibly tainted consent or confession." Id. Here, as in Delancy, the facts of the case suggest "an important intervening

circumstance": defendant's review and signing of the consent form, which served as a notification to defendant of his constitutional rights. As in <u>Delancy</u>, the written consent form unambiguously informed Osborne that he had the right to refuse to consent to the search and to withdraw his consent at any time, and that any evidence seized could be used against him..[8] Tynan went over the form with Osborne carefully, and defendant freely asked questions, received clarification, and appeared to understand his rights. Under the facts of this case, defendant's notification of his constitutional rights constitutes an important intervening circumstance.

### 3. Purpose and Flagrancy of Government Conduct

"The final factor is the purpose and flagrancy of the official conduct." <u>Id</u>. This factor is also the most straightforward, and, as in <u>Delancy</u>, the most important one. If Gaskin's statement to defendant that he would not go to jail if he told the truth had been made for the purpose of gaining consent to search his apartment, the court "would be bound to find the consent tainted. Indeed, when the police act with the express purpose of exploiting an illegal action, the causation is so obvious that no real attenuation analysis is even necessary." <u>Id</u>.

Here, however, the comment by Gaskin was not a subterfuge concocted to give the authorities a colorable reason to search Osborne's residence when they had no probable cause for the issuance of a search warrant. On the contrary, Gaskin and Tynan already had

---

[8] Unlike in <u>Delancy</u>, the consent form in this case did not apprise Osborne of his right to consult with counsel. However, when defendant was Mirandized at the beginning of the interview, he was advised that he had the right to the advice and presence of a lawyer even if he could not afford to hire one. Exhibit 3.

grounds to seek a search warrant prior to Gaskin's promise. Earlier in the interview, Osborne had confessed to taking mail from mailboxes, described various streets where he conducted this activity, identified specific mail that he took out of the boxes and the time that he took it, and acknowledged that mail that he took the day before "could be" back at his apartment. The exchange concerning his apartment was as follows:

> T:   Okay, now yesterday we had a phone call saying that somebody saw
>      you going through mailboxes. What did you do with that mail?
> O:   *No verbal response*.
> T:   Is it back at your apartment, or ...
> O:   To be real honest ...
> T:   Yeah.
> O:   Yeah, it could be. I mean ....

Exhibit 1 (Court's transcription of the recorded statement). This statement, combined with the other facts previously described, constituted probable cause to search Osborne's apartment with or without defendant's subsequent consent.

What Detective Gaskin sought when he promised leniency to defendant if he told the truth was, in fact, the truth – that is, a full confession from Osborne. Nothing in his proposed *quid pro quo* related to consent to search. Thus, Gaskin's promise, while offered for an unlawful purpose, was not offered for the particular unlawful purpose claimed by defendant. His action, even if unlawful, was not flagrantly so, as it had no direct connection with the challenged search.

Taking all three factors together, and evaluating them as a whole, the court concludes that Gaskin's promise did not taint Osborne's consent to search. Accordingly, the deterrent purposes of the exclusionary rule would not be served by excluding this evidence. <u>Herring</u>

14

v. United States, __ U.S. __, 129 S.Ct. 695, 700 (2009).

Consent to search computer

Although defendant did not argue in his suppression motion that consent to search his computer was the fruit of Gaskin's promise, he did maintain at the hearing that everything from the point of Gaskin's promise forward, including the search of the computer, was tainted by that promise. However, for the reasons discussed above, the court concludes that Osborne's consent was voluntary. Indeed, he specifically certified that he gave his written permission to search the computer "voluntarily and without threat or promises of any kind." Exhibit 5.

With regard to the issue of temporal proximity, additional time had elapsed between Gaskin's promise concerning jail and defendant's consent. Gaskin made the promise approximately 21 minutes before the interview concluded at 12:25 p.m. Exhibits 1, 2. The officers completed the search of the apartment before returning to request consent from defendant to search the computer, and Osborne signed the consent to search his computer at 1:54 p.m. Ex. 5. Thus, approximately one hour and 50 minutes elapsed between Gaskin's improper comment and defendant's written execution of consent to search the computer. In the context of this case, the court considers this lack of temporal proximity significant.

In addition, there were intervening circumstances that tended to obviate any taint. Although defendant did remain in continuous custody while the search of the apartment proceeded, he was offered the opportunity to accompany the officers for the search and chose not to do so. After they completed their examination, the officers returned to headquarters,

informed Osborne of the results, and requested additional permission to search the computer. Most importantly, defendant was again reminded of his rights before he signed the second consent form. By signing the form, he certified that he was advised of his constitutional rights not to have a search made of his property without a search warrant, and his right to refuse to consent to such a search.

Finally, the court concludes that Gaskin's promise was not a subterfuge whose purpose was to give the authorities grounds to search Osborne's computer when they otherwise had no probable cause for the issuance of a search warrant. Again, before the promise was made, Osborne already had confessed to taking mail from mailboxes, described various streets where he conducted this activity, and identified specific mail that he took out of the boxes and the time that he took it. He also had demonstrated knowledge of identity theft techniques involving the internet, although he attributed use of these techniques to two apparently fictional accomplices named Didi and Eric:

> O:   And what they do, they, they would drop me off and they would tell me to, they would tell me to get, to get, I'm gonna tell, I'm telling the truth, they would tell me to get letters in white envelopes because those are usually. I got to tell the truth, I mean they ...
>
> T:   Okay, go ahead and tell me.
>
> O:   ...they tell me that those are letters usually from credit card companies or, or stuff like that. I don't, I then...
>
> T:   So they're interested in credit card numbers versus checks?
>
> O:   Yeah, cause they tell me. I'm telling the truth man, I mean, they say they go on the internet and they order stuff with them, you know, I mean because they say the, the security number on the back of credit cards, they're mixed up in that, they mixed up in the, the account number thing, you know that....That's all I know.

Exhibit 1(Court's transcription of the recorded statement). In addition, defendant seems to

16

have at least tacitly acknowledged that he owned a computer prior to Gaskin's statement:

> G:     Does anybody live with you Travis?
> O:     I stay by myself.
> G:     You stay by yourself.
> T:     Do you have a computer?
> U[9]:   Yeah.

Id.

Under these circumstances, the officers could reasonably conclude that they already had probable cause to search any computer owned by defendant prior to Gaskin's promise. In addition, Gaskin's promise related to telling the truth, not consenting to search, and had no direct connection with the challenged search of the computer. Thus, under the totality of the circumstances, defendant's consent to search was not secured by exploitation of the prior illegal promise, but instead by means sufficiently distinguishable to be purged of the primary taint.

### Conclusion

Accordingly, for the foregoing reasons, it is the RECOMMENDATION of the Magistrate Judge that defendant's motion to suppress (Doc. # 15) and supplemental motion to suppress (Doc. # 16) be GRANTED as to that portion of defendant's interview following Gaskin's impermissible promise, and DENIED in all other respects.

It is further

---

[9]  Unknown speaker, most likely Tynan. Before a judge or magistrate authorized to issue search warrants, the officers could have clarified who the speaker was, and whether Osborne had offered a non-verbal or inaudible confirmation that he owned a computer.

17

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before September 4, 2009.  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  Nettles v. Wainwright, 677 F.2d 404 (5th Cir. 1982).  See Stein v. Reynolds Securities, Inc., 667 F.2d 33 (11th  Cir. 1982).  See also Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done, this 25th day of August, 2009.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE